UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


United States of America,                                    Case No.  3:12-cr-00423

              Plaintiff

     v.                                                   MEMORANDUM OPINION
                                                AND ORDER

Carl J. Andrews,

              Defendant


    Defendant Carl J. Andrews was charged in a single-count indictment for threatening to take the life of the President of the United States, in violation of 18 U.S.C. § 871(a).  After waiving his right to a jury trial, and with the government's required consent, I conducted a bench trial on December 6, 2012.  Because the government failed to meet its burden of persuasion that Mr. Andrew's statements constituted true threats against the president, I find Mr. Andrews not guilty.

## I.      Background

    On August 15, 2012, Andrews made two back-to-back telephone calls to the Lucas County, Ohio, emergency operator from a payphone adjacent to the bus station in downtown Toledo, Ohio. In the first call, Andrews immediately stated his full name, disclosed his location at the bus station, and then stated, "I'm planning on going to Washington to cut up Obama."  A compliant Andrews, when asked by the emergency operator to repeat what he said, affirmed his threat, denied he had a weapon stating that he had earlier had a knife but had thrown it away, accurately described his appearance in detail and said he would wait until someone came to talk to him.

Some minutes later, having received no response at the bus station to his first call, Andrews again called the emergency number and spoke with a different operator. He repeated his threat, this time emphasizing his seriousness in making the threat. After again describing himself to the operator, he claimed he had the money to buy a knife, although again denied having a weapon. Relating the rationale for his threats, Andrews described the president as a "communist," intent on placing us all in concentration camps, further stating the president would "have us all eating out of garbage cans."

In his discussions with the operator, he claimed that he tried to get a job, but was unsuccessful claiming "everything I touch turns to bad luck." Andrews also claimed he had to leave his previous residence in Detroit, due to terrible itching on his legs, which he claimed was caused by a curse put on him by the devil. The telephone discussion continued for a few minutes more until two officers of the Toledo Police Department Bicycle Patrol arrived to speak with Mr. Andrews.

Officer Jeff Dorner, an eighteen year veteran patrolman of the Toledo Police Department, responded with his partner. Andrews repeated his threats against the president, stating he intended to take a Greyhound bus to Washington, D.C. to assault the president. Officers searched him and did not find a weapon. In response to Officer Dorner's question as to how he was going to purchase a knife without any money, Andrews stated he would find a way and get the money. After further discussion, Mr. Andrews stated, "You might as well take me to jail because I'm going to kill somebody else." He was arrested and charged with two misdemeanors under Ohio law, Aggravated Menacing and Criminal Trespass. The criminal trespass charge was levied as a result of Mr. Andrews's repeated refusal to leave the bus station area when directed to do so.

In describing his impressions of Mr. Andrews, Officer Dorner thought perhaps he had mental health issues and was off of his medication. He also suspected Andrews may have been homeless based upon his conduct and appearance. Although always compliant with the police, Andrews was adamant about Officer Dorner and his partner taking him to jail. It appears Andrews

2

had no luggage or other bags of any sort.  At booking, Andrews gave his address as the Lorraine Hotel in downtown Toledo.

Federal involvement in the case began two days later, on August 17, when the Toledo office of the United States Secret Service noticed a local newspaper article about Mr. Andrews's arrest. Apparently, the Toledo police had never notified the Secret Service about Mr. Andrews's threats, an omission about which the Secret Service was "less than pleased."

In response to the article, Secret Service Special Agent Andrew Van Engen began his investigation of Andrews.  Agent Van Engen quickly learned Andrews has had prior contact with the Secret Service and requested documentation of those prior contacts.

Prior to receiving the requested documentation, Agent Van Engen and his partner interviewed Andrews at the Lucas County Corrections Center, where he was being held on the state misdemeanor charges.  The local Secret Service office was particularly busy at that time of the year, as President Obama was running for re-election and Ohio was widely considered a "swing state" and therefore likely to receive numerous visits from the president.

At the outset of the interview, Mr. Andrews agreed to sign a form waiving his *Miranda* rights. When asked if he knew what he did in making threats against the president was a crime, Andrews stated he did and understood that was why the agents were there to speak with him.  Andrews was asked repeatedly by Agent Van Engen if the president were standing next to Andrews, and the voices in his head told him to hurt the president, would he?  Andrews responded, yes, he probably would, with a knife.  As a result of these admissions and Andrews's prior conduct with Toledo Police, the United States Attorney's Office for the Northern District of Ohio brought this charge. The state court charges were apparently then dismissed.

In conducting additional investigation, Agent Van Engen learned from Secret Service and other law enforcement records that Andrews had previously been convicted of arson.  Andrews apparently set the fire because the voices in his head had told him to do so.  Andrews has no

history, however, of any violent behavior towards any Secret Service protectee, although he had made prior threats against President Obama and other presidents.

## II.  Legal Standard

In the prosecution of Andrews, the essential elements the government must prove are (1) the Defendant knowingly and willfully made (2) a true threat to take the life of or inflict bodily harm upon (3) the president of the United States.  18 U.S.C. § 871(a).

As an initial matter, there can be little doubt Mr. Andrews made statements threatening to take the life of or inflict bodily harm upon the president.  In his conversations with emergency operators, Andrews repeatedly threatened to "cut Obama" and made other similar threats.  Clearly, he spoke words which, when given their plain meaning, might be readily interpreted as threats of harm or an intent to kill the president of the United States.  The government has easily met its burden in this regard.  But the government must prove more.

Conviction under § 871 requires a finding that Andrews's words constituted a "true threat" against the president.  In determining the existence of a "true threat", our Circuit applies an objective test: "if a reasonable person would foresee that an objective rational recipient of the statement [threat] would interpret its language to constitute a serious expression of intent to harm, kidnap, or kill the President … that message conveys a 'true threat.'"  *United States v. Miller*, 115 F.3d 361, 363 (6th Cir. 1997)(citations omitted).  A threatening communication, however, "need not be supported either by evidence of the author's actual ability to carry out his threat, or his actual subjective intent to do so."[1]  *Id.*

---

[1] I share Circuit Judge Sutton's concerns about the proper interpretation of this and like statutes.  As characterized by Judge Sutton in referring to 18 U.S.C. § 875(c): "Ever since the *Watts* decision in 1969, it has been clear as a matter of constitutional avoidance that threat prohibitions like this one cover only "real" threats, threats in other words that a reasonable observer would take as true and real.  That is all well and good, as it makes sense to interpose this objective requirement on the criminalization of speech.  But that consideration offers no basis for alchemizing the normal meaning of threat into an objective-intent question *alone*.  What should happen instead is this: The statute should require first what the words say (a subjectively intended threat) and second what constitutional avoidance principles demand (an objectively real theat.)" *Jeffries*, 692 F.3d at 485 (Sutton, J., dubitante)(citation omitted).

Although "it matters not what the defendant meant by the communication," the context within which the statement was made must be considered.  *United States v. Jeffries*, 692 F.3d 473, 478 (6th Cir. 2012).  Otherwise, protected – and lawful – forms of speech would be impermissibly punished.  As the court in *Jeffries* explained:

> The reasonable-person standard winnows out protected speech because, instead of ignoring context, it forces jurors to examine the circumstances in which a statement is made: A juror cannot permissibly ignore contextual cues in deciding whether a "reasonable person" would perceive the charged conduct "as a serious expression of an intention to inflict bodily harm."

*Id.* at 480, quoting *United States v. Alkhabaz*, 104 F.3d 1492, 1495 (6th Cir. 1997).

Accordingly, as the trier of fact, I must consider the circumstances surrounding Andrews uttering the threats, not merely their plain meaning.  The proper scope of my review of what constitutes context is strongly disputed by the parties.

### III.    The Scope of Context

The government's position on the appropriate scope of context is clear: I may only consider evidence of what occurred on the day of the threat, August 15, and during the ensuing investigation culminating in the Secret Service interview of the Defendant on August 17.  Anything else, the government argues, necessarily involves evidence of the Defendant's subjective intent to harm the president, and "it matters not what the defendant meant by the communication." *Id.* at 478.

Defendant argues, conversely, that the scope of what constitutes proper context is unclear. In particular, Defendant argues I should consider evidence he offered by way of exhibits and testimony[2] of other threats made by him against President Obama and some of his predecessors, beginning in 1998 and continuing through 2012.  While it would ordinarily be exceedingly surprising

---

[2] Defendant offered Composite Exhibit 1, consisting of reports of prior Secret Service investigations of the previous threats, as well as his testimony and that of his prior supervising U.S. Probation Officer, Eric Corns.  The government objected timely to the relevance of this evidence and maintained properly a continuing objection to this testimony.  The government did not object, however, to my reviewing the evidence in greater detail to make an admissibility determination, trusting the Court to make the appropriate determinations.  Accordingly, I admitted the Defendant's Exhibit and allowed the witness testimony.

that a defendant so accused would seek to introduce evidence of *additional* threats against this and prior presidents, the appeal for Andrews to do so in this case is strong.

In all five of the prior incidents involving threats made by Andrews, the Secret Service deemed the threats insufficiently serious to warrant referral for prosecution.  Additionally, all five incidents seem to suggest that Andrews's statements were not interpreted as a serious expression of intent to harm or kill.  Rather, he expressed a desire to enter federal custody, even going so far as to suggest the federal correctional institution to which he wished to be assigned.  In one notable previous exchange with agents of the Secret Service, Andrews dropped his head dejectedly when told by the agents that he would likely not be committed to a federal institution, because the Secret Service was not pursuing prosecution.

Indeed, there are parallels between those prior incidents and the circumstances surrounding the charge at issue in this case.  For example, here Andrews issued his threats directly to the authorities, describing his appearance and location.  He then repeated the threats for Toledo Police Officers at the scene.  He later waived his *Miranda* rights, repeating the threats again for benefit of the Secret Service Agents.

In his testimony before me, Andrews emphasized his frustration due to his inability to hold a job and his strong aversion to accept any type of government assistance.  Not finding good fortune in Detroit, he migrated south to Toledo to seek employment.  After exhausting his small living allotment from public assistance, he was evicted from the Lorraine Hotel and was essentially homeless.  As a result, he claims, he chose to place the calls and issue the threats against the president, apparently with the expectation that he would be charged, convicted, and sentenced to federal custody, presumably at an institution he would find comfortable and able to meet his mental health needs.

Of course, while the Defendant's interest in advancing this evidence is clear and understandable, it certainly does not make it admissible.

## A.      Relevance of prior "threats"

As an initial matter, Andrews's prior acts must be relevant to the determination of an essential element.  Defendant offers this evidence as relevant to my consideration of the context of Andrews's threats in this case.  Andrews's history of serial threats against our present and prior presidents, he posits, appropriately informs my determination of whether a reasonable person would perceive the charged conduct "as a serious expression of an intention to inflict bodily harm."  Put another way, Defendant argues that his conduct here was no more of a serious expression of an intention to inflict bodily harm than it was in five prior instances, and that his real intent in making these statements, as before, was to obtain housing in a federal correctional institution.

While his argument is superficially seductive, the circumstances surrounding the prior threats are only relevant to my determination if they are properly within the scope of context I may consider in a case such as this.  While I must consider context in determining the seriousness of the expression of the threats, the rationale for such consideration is to avoid unwarranted conviction if the threat "convey[ed] mere political hyperbole, innocuous talk, jest, or the like", *Miller*, 115 F.3d at 363, or if the statement was the result of "mistake, duress, or coercion." *United States v. Glover*, 846 F.2d 339, 343-44 (6th Cir. 1988), quoting *Roy v. United States*, 416 F.2d 874, 877 (9th Cir. 1969).

I have found no cases which help inform me of the appropriate scope of context in a charge such as this.  It seems to me that such prior instances may be beyond that scope and therefore are irrelevant to my determination.  Nevertheless, even if these statements are of some relevance, Andrews must clear at least one other hurdle to admissibility of this evidence.

## B.      Other Acts Evidence

Even if relevant, Defendant's evidence of prior threats is subject to the prohibition in Fed. Evid. R. 404(b)(1):

> **(1) Prohibited Uses.**  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

7

While this provision is often identified exclusively with the government seeking to introduce evidence of a defendant's prior crimes, wrongs or other "bad acts," the Rule is in no way limited to the prosecution of criminal cases.  Indeed, although rare, there are instances when a Defendant has sought to introduce such evidence.  *See, e.g., United States v. McClure*, 546 F.2d 670 (5th Cir. 1990) (reversing conviction due to the trial court's error in excluding testimony of three witnesses offered by defendant in support of coercion defense, to establish that government's paid informant had also coerced witnesses into narcotics sales).

Andrews's prior acts evidence would seem to be precluded under this portion of Rule 404.  There are, of course, possible exceptions to this rule, contained in subsection (b)(2), which states, in relevant part, "this evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

Any temptation to admit the prior threats is tempered by the government's argument that admitting such evidence effectively would be admitting, and thereby considering,  evidence of the Defendant's motive or subjective intent, which the law states I may not do.  *Miller*, 115 F.3d at 363 (6th Cir. 1997) ("a prosecutable threatening communication need not be supported either by evidence of the author's actual ability to carry out his threat, or his actual subjective intent to do so").

These prior threats unquestionably would support Andrews's argument for acquittal; none of these evidentiary issues, however, is dispositive of the outcome in this case.  As I describe below, I have confined the scope of my review for context to the events which transpired in the several days before Andrews uttered these statements.  Accordingly, I need not reach any final decision about the admissibility of his prior threats.  Even without considering them, and within the limited scope of context, the government has failed to meet its burden of persuasion regarding Andrews's threats constituting a "true threat" as required for conviction.

Likewise, I will not consider the government's claim that Andrews's conviction for arson, a crime he claimed he committed because "the voices in his head" told him to do so, informs my verdict in this case. The government faces similar evidentiary barriers concerning relevance, Fed. Evid. R. 404(b), 403, as well as Rule 609 (limited only to attacking the Defendant's character for truthfulness, and unlikely to be admissible anyway given that more than 10 years had passed since conviction or release).

## IV.    Context and a "true threat"

For purposes of this case, proper context begins with Andrews's departure from Detroit at the beginning of August, 2012, and continues through his interview with Secret Service agents on August 17. This time period informs the objectively rational recipient, as well as the reasonable observer, of the circumstances and events – Andrews's lack of funds, his homelessness and growing desperation, all confirmed by uncontroverted testimony – affecting Mr. Andrews at the time of the incident.

Andrews's departure from Detroit was apparently driven by discomfort he was experiencing, which he attributed to a curse placed on him by the devil, as well as his failure to be able to obtain and sustain gainful employment. He apparently fared no better upon arriving in Toledo, as he quickly exhausted what financial support he does receive on rent and other living expenses while residing at the Lorraine Hotel. Evicted after about ten days, he moved to an area homeless shelter, but crowding conditions coupled with the hours of operation rendered him essentially homeless.

Compounding Andrews's financial and employment problems, as well as casting doubt on whether his statements were "a serious expression of intent to harm", was his ongoing mental illness. While his belief in the curse that caused his skin irritation might be evidence enough of his impairment, he also testified about his serious mental health history. Andrews suffers from both paranoid schizophrenia and bipolar disorder. He was diagnosed at age eleven, the same year he first

received psychotropic medication and was first committed for his illness.  He was housed at numerous children's homes and hospitals throughout his life and still struggles with his mental illness.

Also worthy of consideration is Andrews's visit to his former probation officer, Eric Corns. Mr. Corns testified that Andrews arrived at the Toledo office of the United States Probation Office several days before his arrest.  He was not under any form of supervision any longer, nor had he called ahead to announce his arrival.  He told Mr. Corns that things hadn't worked out for him in Detroit, so he came down to Toledo.  These practical difficulties in Andrews's life gave Mr. Corns pause, as Andrews had on prior occasions told Mr. Corns of his desire to return to federal custody.

His impairment was obvious to Officer Dorner who arrived at the payphone on August 15. The officer testified that he appeared to have mental problems and to be off his medication.  While Andrews's behavior may give an observer cause for concern about his dangerousness and therefore the seriousness of his expression to do harm, it also draws some question about the seriousness of his threats.

On August 15, officers only chose to arrest Andrews after he refused to leave the property after being repeatedly instructed to do so, and after he continued to repeat threats against the president.  Even then, he was charged with only two misdemeanors.  No referral was made by local authorities to the Secret Service, as Agent Van Engen only learned of the threat while reading the local newspaper two days later.  Little of Andrews's conduct at the bus station payphone might be considered any serious expression of an intention to inflict bodily harm upon the president.  Indeed, Andrew's conduct evinces only a strong expression of an intent to be discovered and imprisoned.  A reasonable person likely would not foresee that an objectively rational recipient of the statement would interpret its language to constitute a serious expression of intent to harm or kill the president.

First, Andrews went to considerable effort to attract the attention of law enforcement. Andrews's threats were not overheard or intercepted by law enforcement or concerned citizens.

Andrews placed the call to the emergency operator and immediately identified himself and his location outside the bus station.  Only then did he utter his threat.  When prompted, he provided his race and described in great detail his clothing, and also truthfully denied having any weapons.  He expressed his approval after the operator informed him that he would "send someone out there" to talk to Andrews.

Apparently frustrated after waiting for some time without the arrival of any law enforcement officers, Andrews again called the emergency operator, quickly identifying himself as the man who had just called about harming the president.  He repeated his name and description of his appearance.  While he again denied having a weapon, he claimed he had money to purchase one, though Officer Dorner testified this proved to be untrue.

Upon the arrival of uniformed officers at the bus station, Andrews repeated his threats about harming the president.  Because of his insistence and refusal to leave the bus station grounds, the officers arrested Andrews and charged him with Aggravated Menacing and Criminal Trespass.  In addition, the officers apparently thought little enough of Andrews's threats so as to not notify the Secret Service, whose agents learned of the incident only through a newspaper article about Andrews's arrest which ran two days afterward.

Further, during interviews with Secret Service Agents at the county jail, Andrews readily waived his *Miranda* rights and agreed to speak with the agents, acknowledging he understood the agents were there to investigate his threats against the president.  Andrews told the agents he was homeless.  In fact, he was destitute.

As the trier of fact, I "cannot permissibly ignore contextual cues in deciding whether a 'reasonable person' would perceive [Andrews's statements] 'as a serious expression of an intention to inflict bodily harm.'"  *Jeffries*, 692 F.3d at 480.  Andrews's appearance, statements, and conduct, as well as the reactions and responses of the emergency dispatchers, police officers, and other individuals who spoke with and encountered Andrews on and in the days before August 15 form the

context through which Andrews's statements must be viewed.  These contextual cues persuade me the government has failed to demonstrate Andrews made a "true threat."  All told, I cannot conclude the government has met its burden of establishing by proof beyond a reasonable doubt that a reasonable person would foresee that an objectively rational recipient of these statements would interpret this language to constitute a serious expression of intent to harm or kill the president, within the appropriate context within which these statements were made.

Because the government has failed to meet its burden on this essential element of the offense, I find Defendant Carl Andrews Not Guilty of the single count of the Indictment and order a Not Guilty finding to be entered in his case.  In light of this finding, Mr. Andrews is ordered released forthwith.

So Ordered.


s/ Jeffrey J. Helmick
United States District Court Judge